## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA BENNETT, | ) | Case No. 1:25-cv-01853 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jonathan D. Greenberg |
| SRS DISTRIBUTION, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Jessica Bennett brings claims against Defendant SRS Distribution, Inc., for sex discrimination and unlawful retaliation in her employment. Defendant moves to compel arbitration and stay the proceedings. For the reasons stated below, the Court **GRANTS** Defendant's motion.

## BACKGROUND

### A.    Employment and Termination

In July 2006, Ms. Bennett began working at Willoughby Supply store in Elyria, Ohio. (ECF No. 1-1, ¶ 5, PageID # 10.) In January 2022, SRS Distribution purchased Willoughby Supply. (*Id.*) Shortly after that, Ms. Bennett was promoted to branch manager at the store's Elyria location. (*Id.*, ¶ 6, PageID #10.) In late 2023, David Pilkington became a regional manager for SRS Distribution. (*Id.*, ¶ 7, PageID #10.) As regional manager, Mr. Pilkington supervised the Elyria store and Ms. Bennett. (*Id.*)

In her complaint, Ms. Bennett alleges that she and Mr. Pilkington worked together before 2006 and during that time developed a romantic relationship as coworkers.  (*Id.*, ¶ 8, PageID #10.)  When Ms. Bennett ended their affair, Mr. Pilkington was disgruntled and "became abusive and sexually harassing toward her so she had to leave that prior employment, ultimately being hired at Willoughby Supply." (*Id.*, PageID #10–11.)

In 2024, as Mr. Pilkington's subordinate, Ms. Bennett "was forced to report directly to [him]." (*Id.*, ¶ 10, PageID #11.)  By February 2024, Mr. "Pilkington became abusive towards Ms. Bennett, making it difficult for her to continue her employment." (*Id.*, ¶ 11, PageID #11.)  In the summer of 2024, Mr. Pilkington overrode Ms. Bennett's hiring discretion and appointed an assistant regional manager to Ms. Bennett's store whom she considered unqualified.  (*Id.*, ¶ 13, PageID #11.)  Also, he also placed Ms. Bennett on a performance improvement plan.  (*Id.*, ¶ 15, PageID #12.)

Following these incidents, Ms. Bennett complained to Aaron Elliott, the chief operating officer of SRS Distribution, that Mr. Pilkington had usurped her authority. (*Id.*, ¶ 14, PageID #11.)   She disclosed her previous affair with Mr. Pilkington and represented that he "had sexually harassed [Ms. Bennett] and caused her to leave her previous employment." (*Id.*)  In response to this information, the chief operating officer overruled her performance improvement plan and assigned a Michigan-based regional manager to oversee Ms. Bennett and the Elyria store.  (*Id.*, ¶ 15, PageID #12.)

On January 31, 2025, Ms. Bennett's new regional manager told her she was "doing a great job." (*Id.*, ¶ 16, PageID #12.) But on February 14, 2025, she was summarily terminated from SRS Distribution. (*Id.*) Her position was filled by the assistant regional manager whom Mr. Pilkington previously hired over Ms. Bennett's objections. (*Id.*) Ms. Bennett notes that there are eight branch stores in SRS Distribution's Ohio region, and she was the only woman who managed a branch. (*Id.*, ¶ 17, PageID #12.)

**B.      Mutual Arbitration Agreement**

SRS Distribution alleges that the company and Ms. Bennett entered into a mutual arbitration agreement before her termination. (ECF No. 14.) Specifically, it alleges that, on October 16, 2023, SRS Distribution emailed Ms. Bennett and other branch managers in to notify them of an arbitration agreement that would be sent to them through the company's Workday platform and that all new and existing nonunion employees were required to acknowledge the agreement. (ECF No. 14-1, PageID #151–55; ECF No. 14, PageID #124.) An attachment to this email explained that "current employees are required to agree to the [arbitration agreement] as a condition of continued employment. . . . If a current employee chooses to remain employed with the Company for thirty days after the date when the [arbitration agreement] is sent to them, they are deemed to have accepted and agreed to the [arbitration agreement]." (ECF No. 14-1, PageID #155.)

SRS Distribution explains that Workday "is a secure platform that requires individual login and password information" for account access. (ECF No. 14-1, ¶ 11, PageID #137.) Branch managers such as Ms. Bennet used Workday to perform their

daily duties. (Id., ¶ 10, PageID #136.) The platform contains a task list, notifications, and an email-style inbox. (*Id.*, ¶¶ 13–15, PageID #137.) The task list "displays all outstanding tasks for that employee, including the execution of any employment related documents." (*Id.*, ¶ 13, PageID #137.)

On October 17, 2023, SRS Distribution sent the arbitration agreement to the Workday inboxes of all nonunion employees. (*Id.*, ¶ 16, PageID #137; ECF No. 14, PageID #126.) On October 18, 2023, Ms. Bennett's Workday account was accessed and her arbitration agreement was digitally executed. (ECF No. 14-1, PageID #137.)

In support of these allegations, SRS Distribution provides the October 16, 2023 email to branch managers (ECF No. 14-1, PageID #151–55), a printed record of Ms.Bennett's acknowledgements of company policies (*Id.*, PageID #157), and a declaration signed by Ryan Salazar, Human Resources Business Partner at SRS Distribution. (*Id.*, PageID #134–37). The printed record of her policy acknowledgments shows that on October 18, 2023 at 13:11, Ms. Bennett acknowledged a mutual arbitration agreement by clicking, 'I Agree.' (*Id.*, PageID #157.)

Also, the company provides a copy of the arbitration agreement (*Id.*, PageID #139-43.) In relevant part, it provides that:

> **ALL DISPUTES COVERED BY THIS AGREEMENT SHALL BE DECIDED BY AN ARBITRATOR THROUGH FINAL AND BINDING ARBITRATION AND NOT BY WAY OF COURT, JURY TRIAL OR ANY OTHER ADJUDICATORY PROCEEDING AS SET FORTH HEREIN.**

*       *       *

4

[T]his Agreement applies to any and all existing or future disputes between you and the Company so that you are bound to arbitrate all disputes, including any claims and disputes regarding your recruitment, employment and/or separation of employment with the Company.  This Agreement survives after your employment relationship with the Company terminates[.]

*     *     *

The claims subject to arbitration are those that, in the absence of this Agreement, could be otherwise brought under applicable law in a court of law or before a forum other than arbitration.  Except as it otherwise provides, the Agreement applies, without limitation, to claims based upon or related to discrimination, harassment, retaliation, defamation (including post-employment defamation or retaliation) . . . termination, tort claims, equitable claims, and all statutory and common law claims (unless specifically excluded below in the Excluded Claims/Disputes section), and, including without limitation, claims arising under Title VII of the Civil Rights Act of 1964 . . .

(ECF No. 14-1, PageID #139.)

The agreement reiterates that it may be accepted through explicit acknowledgement or through continued employment with SRS Distribution:

**ACCEPTANCE OF AGREEMENT**
Employment or continued employment is contingent on acceptance of this Agreement.  Employee accepts this Agreement by accepting employment with the Company, or by continuing employment with the Company for 30 days after the Company provides notice of this Agreement via mail, email, Workday, or otherwise.

(*Id.*, PageID #143.)

In response, Ms. Bennett provides an affidavit in which she states that she "do[es not remember" whether she received or viewed the October 16 email or its attachment, she "do[es] not recall ever having received or viewed" the arbitration agreement, and she "do[es] not recall having clicked on any box, link or hyperlink that would indicate [her] acceptance of the terms" of the arbitration agreement.  (ECF

5

No. 15, ¶¶ 4–6, PageID #165.)  Further, she attests that, "[t]o the best of [her] knowledge and recollection, [she] did not sign any acceptance to the mandatory Arbitration Agreement that was allegedly sent to [her]."  (*Id.*, ¶ 7, PageID #166.)

### C.    Previous Invocations of the Arbitration Agreement

On June 9, 2025, Plaintiff filed suit in State court.  (ECF No. 1-1, PageID #9.) After removing the case on September 1, 2025 (ECF No. 1), Defendant emailed Plaintiff's counsel to request that the parties resolve the case through arbitration pursuant to the arbitration agreement (ECF No. 16-1, PageID #175).  According to Defendant, this email received no response.  (ECF No. 16, PageID #171–72.)

Four days later, Defendant answered Plaintiff's complaint and asserted that the arbitration agreement barred each of Plaintiff's claims.  (ECF No. 5, ¶¶ 18, 28 & 48, PageID #43 n.1, 46 n.2 & 50.)  Among its affirmative defenses, Defendant emphasized that the agreement "has not been waived and Defendant seeks to enforce it."  (*Id.*, ¶ 48, PageID #50.)

On November 24, 2025, the Court held a case management conference at which both parties were represented.  (Minutes, November 25, 2025.)  There, "Defense counsel indicated that they intend to move to compel arbitration."  (*Id.*)  Based on this conference, the Court set a schedule for the motion to compel and its responses, as well as for written discovery requests.  (ECF No. 12.)

### STATEMENT OF THE CASE

Plaintiff Jessica Bennett filed suit against her former employer, Defendant SRS Distribution, Inc., in State court.  (ECF No. 1.)  In her complaint, she asserted

claims for sex discrimination in employment and unlawful retaliation in employment. (ECF No. 1-1, PageID #12–16.)

On September 5, 2025, Defendant removed the suit to this Court based on diversity jurisdiction under 28 U.S.C. § 1332.  (ECF No. 1, ¶ 5, PageID #2.)  Defendant answered on September 26, 2025.  (ECF No. 5.)  On December 19, 2025, Defendant moved to compel arbitration and stay the proceedings.  (ECF No. 14.)

In support of its motion, Defendant argues that, under the Federal Arbitration Act, Plaintiff's "claims are subject to mandatory arbitration as set forth in the [arbitration agreement] acknowledged by Plaintiff on October 18, 2023."  (*Id.* at PageID #121.)  In response, Plaintiff argues that she never accepted such an agreement and attests that she does not remember receiving or signing it.  (ECF No. 15, PageID #160–62 & #165–66.)  Additionally, she argues that Defendant waived its right to arbitrate by failing to invoke it earlier in the litigation process.  (*Id.*, PageID #163–64.)

## ANALYSIS

Enacted in response to a perception that federal courts were unduly hostile toward arbitration, the Federal Arbitration Act "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The Act makes arbitration agreements "as enforceable as other contracts, but not more so." *Parker v. Tenneco, Inc.*, 114 F.4th 786, 792 (6th Cir. 2024) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022)).

7

The "principal purpose" of the Federal Arbitration Act is to ensure "that private agreements to arbitrate are enforced according to their terms." *Volt Info. Scis., Inc. v. Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010). Section 2 of the Act makes arbitration agreements "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

To compel arbitration under the Federal Arbitration Act, "a court must conclude that (1) the parties agreed to arbitrate, (2) their agreement covers the claims at issue, and (3) Congress intended those claims to be arbitrable." *Gavette v. United Wholesale Mortg., LLC*, 2025 WL 318224, at *1 (6th Cir. Jan. 28, 2025) (citing *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)). A "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable[.]" 9 U.S.C. § 2.

Where a party moves to compel arbitration in compliance with an agreement, "[t]he party seeking arbitration must prove that such an agreement exists." *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 798 (6th Cir. 2023) (citing *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. July 1, 2021)). If the agreement's existence is disputed, Rule 56 of the Federal Rules of Civil Procedure governs that issue. *Boykin*, 3 F.4th at 838. Under this rubric, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the motion to

8

compel arbitration must be denied.  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  If a genuine issue of material fact arises as to whether the parties contracted to arbitrate, the court "shall proceed summarily to the trial" on the disputed question. 9 U.S.C. § 4.

Otherwise, if the court determines that an agreement to arbitrate existed and that the action is referable to arbitration, a court "shall on application of one of the parties stay" the case pending arbitration.  9 U.S.C. § 3; *see Smith v. Spizzirri*, 601 U.S. 472, 473–74 (2024).  Section 3 of the Act does not permit the Court to dismiss the case instead of issuing a stay where the dispute is subject to arbitration and a party requests a stay pending arbitration.  *Smith*, 601 U.S. at 478.

## I.      Agreement to Arbitrate

The parties dispute whether Plaintiff accepted the arbitration agreement. "When deciding whether the parties agreed to arbitrate a certain matter," courts generally apply the "ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  A federal court exercising diversity jurisdiction must apply the substantive laws of the State in which it sits.  *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938).  Here, the underlying events took place in Ohio, and the parties agree that Ohio law applies.

Both Ohio courts and federal courts recognize a strong public policy favoring arbitration.  *Hayes v. Oakridge Home*, 122 Ohio St. 3d 63, 2009-Ohio-2054, 908 N.E.2d 408, ¶ 15; *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). Nonetheless, "arbitration is strictly a matter of consent."  *Sheet Metal Emps. Indus.*

*v. Absolut Balancing Co.*, 830 F.3d 358, 362 (6th Cir. 2016) (citing *Volt Info. Scis.*, 489 U.S. at 479).  Therefore, "generally applicable contract defenses may apply in arbitration cases just as they do elsewhere." *Parker*, 114 F.4th at 792 (cleaned up).

### I.A.  Acceptance by Acknowledgment

Defendant argues that Plaintiff accepted the arbitration agreement by logging into her Workday account and signing the agreement electronically.  (ECF No. 14, PageID #126–29.)  Plaintiff has "no recollection" of having received or viewed the arbitration agreement and "denies any knowledge of having clicked any boxes or terms that would indicate her acceptance." (ECF No. 15, PageID #160.)

Parties may accept arbitration agreements through handwritten or electronic signatures.  "A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation." *Jones v. U-Haul Co. of Mass. & Ohio Inc.*, 16 F. Supp. 3d 922, 934–35 (S.D. Ohio 2014) (quoting Ohio Rev. Code § 1306.06). Similarly, a party may simply click an online acknowledgement button to accept an arbitration agreement.  *Uszak v. AT&T Mobility Servs. LLC*, 658 F. App'x 758, 763 (6th Cir. 2016).

Failure to remember agreeing to a contract is "not sufficient to raise a material issue as to the validity of the agreements." *Batiste v. Island Records, Inc.*, 179 F.3d 217, 223 (5th Cir. 1999).  "[T]there is an important conceptual difference between "I don't remember" and "I didn't sign it," and the latter—backed by evidence—is what would be required to overcome [an opposing party's] proffer of a signed contract." *Gallagher v. Vokey*, 860 F. App'x 354, 359 (5th Cir. 2021).  "A party thus cannot expect to obtain a trial under [the Federal Arbitration Act] by simply testifying that the

party does not "remember" signing an arbitration contract or receiving information about an arbitration." *Boykin*, 3 F.4th at 840.

In this case, Ms. Bennett attests that she does not remember receiving, viewing, or signing the arbitration agreement. To prove that she did, Defendant provides a notification email Plaintiff received, a record of her electronic acknowledgment, and the sworn statement from human resources personnel. In the face of this evidence, Ms. Bennett's memory lapse is insufficient to create a genuine issue of material fact whether she accepted the agreement.

### I.B. Acceptance by Continued Employment

Additionally, and in any event, Defendant contends that Plaintiff accepted the agreement by continuing her employment with SRS Distribution for more than 30 days after the agreement was provided to her because she was made aware that "[i]f a current employee chooses to remain with the Company for thirty days after the date when the [mutual arbitration agreement] is sent to them, they are deemed to have accepted and agreed to [it]." (ECF No. 14-1, ¶ 8, PageID #135–36 & 143; ECF No. 16, PageID #168–69.) Plaintiff does not respond to this point.

Under Ohio law, employees may accept an arbitration agreement by such means, provided their employer communicates that continued employment is conditioned on accepting the arbitration agreement. *Dantz v. Americn Apple Grp., LLC.*, 123 F. App'x 702, 708 (6th Cir. 2005) (citing *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, 32, ¶¶ 19–20 (2004)).

11

Defendant provides evidence that SRS Distribution informed Ms. Bennett that her continued employment was conditioned on acceptance of the arbitration agreement. The October 16, 2023 email to branch managers communicated as much. (ECF No. 14-1, ¶ 8, PageID #135–36 & #143.) SRS Distribution reiterated the condition in the arbitration agreement itself, which states that "continued employment is contingent on acceptance of this Agreement. Employee accepts this Agreement by accepting employment with the Company, or by continuing employment with the Company for 30 days after the Company provides notice of this Agreement via mail, email, Workday, or otherwise." (ECF No. 14-1, PageID #143.) After this notice, Ms. Bennett worked for SRS Distribution until February 14, 2025. (ECF No. 1-1, ¶ 16, PageID #42.)

Regardless of her memory of acceptance, the record leaves no doubt that SRS Distribution conditioned Ms. Bennett's continued employment on acceptance of the arbitration agreement. Therefore, by continuing her employment, Ms. Bennett accepted that agreement.

## II.  Defendant's Waiver of Right to Arbitrate

"[I]t has long been settled that a party can waive its contractual right to arbitration." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012); *see American Locomotive Co. v. Gyro Process Co.*, 185 F.2d 316, 318 (6th Cir. 1950)). But prevailing on an arbitration waiver argument requires overcoming the "strong presumption in favor of arbitration." *Schwebke v. United Wholesale Mortg. LLC*, 96 F.4th 971, 974 (6th Cir. 2024) (quoting *Glazer v. Lehman Bros., Inc.*,

394 F.3d 444, 450 (6th Cir. 2005)).  Therefore, "waiver of the right to arbitration is not to be lightly inferred.'" *Id.*

A party forfeits its right to arbitrate where "its conduct was completely inconsistent with reliance on its arbitration right." *Schwebke*, 96 F.4th at 977.  By "failing to plead arbitration as an affirmative defense and by actively participating in litigation for almost a year" without asserting its right to arbitrate, a defendant behaves in a manner inconsistent with reliance on its arbitration right.  *Johnson Assocs.*, 680 F.3d at 717-718 (citing *Manasher v. NECC Telecom*, 310 F. App'x 804, 806 (6th Cir. 2009)).  "[A] defendant's failure to raise arbitration as an affirmative defense shows his intent to litigate rather than arbitrate." *Id.* at 718.

Here, Defendant raised arbitration as an affirmative defense.  But Plaintiff argues that Defendant waived its right to arbitrate by participating in the litigation for several months before moving to compel arbitration.  (ECF No. 15, PageID #164.)  On this record, that suggestion is not well taken.  Defendant stated its intention to arbitrate at every reasonable juncture:  in its answer, in correspondence with opposing counsel, and in the initial case management conference.  Defendant filed its motion to compel in accordance with the schedule set at that conference.  (ECF No. 12.)  Compliance with a court's orders and procedures to ensure an orderly disposition of a motion to compel arbitration does not waive the right to arbitrate.  Any participation in discovery appears to be consistent with the same schedule and the Court's direction.  (*Id.*)  Under these circumstances, Defendant's conduct is not

inconsistent with reliance on its arbitration right, and Defendant has not waived that right.

## CONCLUSION

For all these reasons, the Court **GRANTS** Defendant's motion to compel arbitration (ECF No. 14) and **STAYS** this case pending those proceedings.  The Court directs the parties to file a joint report on the status of the arbitration by December 30, 2026.

**SO ORDERED.**

Dated:  August 10, 2026

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

14